IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

SUNDAY L. MESSINA, individually )
and as next friend of D.M.,       )
                                  )
                    Plaintiff,    )
                                  )
          vs.                     )
                                  )
AETNA HEALTH, INC.,               )
                                  )    No. 2:11-cv-1498-HRH
                    Defendant.    )
_____ )

O R D E R

Plaintiff Sunday L. Messina, individually and as next of friend of D.M., brings this action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. Plaintiff seeks review of the denial by defendant Aetna Health, Inc. of plaintiff's claim for air ambulance service. Plaintiff has filed an opening brief,[1] to which defendant has responded.[2] Oral argument was not requested and is not deemed necessary.

Facts

Plaintiff was a participant in an ERISA plan for which defendant is the claim administrator. Defendant has "the sole discretion" to determine "eligibility for benefits, coverage for

---

[1]Docket No. 45.

[2]Docket No. 49.

-1-

services, [and] benefit denials....”[3] Defendant is also responsible
for paying claims under the Plan.  Plaintiff's minor son, D.M., was
eligible for benefits under the Plan as a dependent child of
plaintiff's.

The Plan provides:

> A Member shall be entitled to the Covered
> Benefits as specified below, in accordance with
> the terms and conditions of this Certifi-
> cate.[4] Unless specifically stated otherwise,
> in order for benefits to be covered, they must
> be Medically Necessary.  For purposes of
> coverage, HMO[5] may determine whether any
> benefit provided under the Certificate is
> Medically Necessary[.6]

In order to be "Medically Necessary", a service must:

> • be care or treatment as likely to produce
> a significant positive outcome as, and no
> more likely to produce a negative outcome
> than, any alternative service or supply,
> both as to the disease or injury involved
> and the Member's overall health condition;
>
> • be care or services related to diagnosis
> or treatment of an existing illness or
> injury, except for covered periodic health
> evaluations and preventive and well baby
> care, as determined by HMO;

---

[3]SEALED Admin. Rec. at 122, Docket No. 51.

[4]The Plan was created when defendant issued a Certificate of
Coverage pursuant to a Group Agreement dated January 1, 2010
between defendant and Paychex Business Solutions.

[5]"HMO" means Aetna Health.  See SEALED Admin. Rec. at 89,
Docket No. 51.

[6]SEALED Admin. Rec. at 105, Docket No. 51.

- be a diagnostic procedure, indicated by the health status of the Member and be as likely to result in information that could affect the course of treatment as, and no more likely to produce a negative outcome than, any alternative service or supply, both as to the disease or injury involved and the Member's overall health condition;

- include only those services and supplies that cannot be safely and satisfactorily provided at home, in a Physician's office, on an outpatient basis, or in any facility other than a Hospital, when used in relation to inpatient Hospital Services; and

- as to diagnosis, care and treatment be no more costly (taking into account all health expenses incurred in connection with the service or supply) than any equally effective service or supply in meeting the above tests.[7]

Included in the Plan's definition of "Non-medically necessary services" are "services and supplies ... furnished primarily for the personal comfort or convenience of the Member, or any person who cares for the Member, or any person who is part of the Member's family, or any Provider[.]"[8]

The Plan "provides for two levels of Appeal from [an] adverse benefit determination."[9]  The Plan also provides for an independent, external review of benefit determinations.[10]  The Plan provides that

---

[7]SEALED Admin. Rec. at 105-106, Docket No. 51.

[8]SEALED Admin. Rec. at 119, Docket No. 51.

[9]SEALED Admin. Rec. at 132, Docket No. 51.

[10]SEALED Admin. Rec. at 133, Docket No. 51.

this external review is available "[a]t any time in the process...."[11]

D.M. was a 16-year-old boy with a history of bipolar disorder, anxiety, schizophrenia, and self mutilation.[12]  In June 2010, D.M. was in a residential treatment facility in Maine due to his psychiatric and substance abuse issues.[13]  On June 2, 2010, D.M. underwent arthroscopic medial meniscus repair of his left knee at Waldo County General Hospital in Belfast, Maine.[14]  D.M. was stable for the first few days but then began to experience increased pain.[15]  On June 6, 2010, he was transported back to Waldo by ambulance.[16]  D.M. "presented with signs and symptoms of septic arthritis."[17]  He "was taken immediately to the OR for an arthroscopic lavage [therapeutic irrigation] of the knee."[18]  The joint fluid cultures indicated that D.M. had a staph infection.[19]  After the lavage, the appearance of the knee improved "but pain control ... was very

---

[11]SEALED Admin. Rec. at 133, Docket No. 51.

[12]SEALED Admin. Rec. at 3 & 8, Docket No. 51.

[13]SEALED Admin. Rec. at 8 & 55, Docket No. 51.

[14]SEALED Admin. Rec. at 28 & 49, Docket No. 51.

[15]SEALED Admin. Rec. at 55, Docket No. 51.

[16]SEALED Admin. Rec. at 55, Docket No. 51.

[17]SEALED Admin. Rec. at 49, Docket No. 51.

[18]SEALED Admin. Rec. at 50, Docket No. 51.

[19]SEALED Admin. Rec. at 50, Docket No. 51.

difficult and the patient at times was inconsolable to the point of being frankly psychotic."[20]

On June 8, 2010, it was noted that D.M. had a "very low threshold to having any interaction or care given" and that the primary nurse felt "that it isn't based on medical symptoms but perhaps anxiety."[21]  It was also noted that D.M. was "frequently screaming out" and that he was "now displaying some psych symptoms that are becoming far more difficult to handle...."[22]

On June 9, 2010, it was noted that D.M. was "reacting very adversely to movement and complains of pain.  Didn't do as well with [physical therapy]."[23]  Also on June 9, 2010, the Waldo utilization review (UR) department advised defendant that D.M.'s doctor was "requesting transfer to a medical facility that can also manage psych & found bed @ Maine Medical, but family wants [patient] to transfer to Mass. General[.]"[24]  D.M.'s case worker noted that "Dr. Bower has been contacting Spring Harbor, Me Medical and Mass. General, however, insurance declined out of state approval...."[25]

On June 10, 2010, the Waldo UR department informed defendant

---

[20]SEALED Admin. Rec. at 50, Docket No. 51.

[21]SEALED Admin. Rec. at 53, Docket No. 51.

[22]SEALED Admin Rec. at 8, Docket No. 51.

[23]SEALED Admin. Rec. at 53, Docket No. 51.

[24]SEALED Admin. Rec. at 8, Docket No. 51.

[25]SEALED Admin. Rec. at 53, Docket No. 51.

-5-

that D.M. continued to have uncontrolled pain and that a crisis evaluation had been requested, in part "to help locate a bed in a facil[it]y that can treat medical and psychiatric issues as [patient] is exhibiting anxiety and wants his mom to be around."[26] Defendant's medical reviewer noted that both Maine Medical and Mass General were participating providers, but that "coverage for transfer to Mass General is not covered in this situation since there is a facility in the present service area that can provide the services needed.  Family request for t[ransfer] to mass gen. Provider recommending local facility."[27]

On June 11, 2010, a second lavage was done.[28]  Although the appearance of D.M.'s knee improved, his white blood cell count continued to increase.[29]  The Waldo UR department left a voicemail with defendant, advising that a crisis evaluation had been ordered the night before but had not yet been completed, and that the treating doctor "would like for p[atient] to be in psych/ortho/rehab facility.  Parents would like for him to go to Mass General but [Mass General] is not sure they can accommodate him."[30]  Defendant

---

[26]SEALED Admin. Rec. at 6, Docket No. 51.

[27]SEALED Admin. Rec. at 7, Docket No. 51.

[28]SEALED Admin. Rec. at 50, Docket No. 51.

[29]SEALED Admin. Rec. at 50, Docket No. 51.

[30]SEALED Admin. Rec. at 4, Docket No. 51.  On September 9, 2010, Dr. Thomas Gill, an orthopaedic surgeon at Mass. General,
(continued...)

noted that "coverage for transfer to Mass General is not covered in this situation since there is a facility in the present service area that can provide the services needed."[31]

By June 14, 2010, D.M.'s white blood cell count reached 20,000, indicating a serious infection.[32]  The Waldo UR department left a voicemail message for defendant, advising that D.M.'s white blood cell count was still climbing, that the crisis team had not been able to evaluate D.M. "due to the number of urgent cases from ER which take precedence," and that "[p]arents are requesting to tra[ns]fer him to Tampa General which is close to their home and family and they are willing to pay for air medical flight if insurance will not cover.  Feel this facility would be best for him and MD agrees as will have acces[s] to [infectious disease], ortho and psych."[33]  Defendant left a voicemail for the Waldo UR department advising that "Tampa General is a [participating] facility so would be okay to transfer if medically okay with MD however insurance will

---

[30] (...continued)
confirmed that he "could not accept [D.M.] for transfer on June 15, 2010."  SEALED Admin. Rec. at 298, Docket No. 51.

[31] SEALED Admin. Rec. at 7, Docket No. 51.

[32] SEALED Admin. Rec. at 50, Docket No. 51.

[33] SEALED Admin. Rec. at 2, Docket No. 51.

not authorize air transport unles[s] there is a medical emergency and will not cover for family convenience."[34]

On June 14, 2010, D.M. was discharged from Waldo. D.M.'s treating physician, Dr. Nelson, noted that D.M.'s treatment team had "concluded that a transfer to a tertiary care center would be in the best interests of the patient. The transfer will gain access to infectious disease consultants (unavailable in WCGH), pediatric psychiatry (unavailable in WCGH), and with transfer to Tampa, Florida will allow his family to be physically present for support and guidance."[35] At the time of his discharge from Waldo, D.M.'s condition was stable, his wounds were "clean and dry and require[d] no attention" but the "[s]epsis in the left knee [was] NOT under control...."[36] Dr. Nelson stated that "there is no advantage in delaying transfer...."[37]

D.M.'s case manager noted that

> [p]arents have decided to have [D.M.] return to Florida for his continued medical care needs. Referral [to] Tampa Bay General Hospital was made.... Tampa General will be able to provide the patient with the Psychological, Orthopedic and Infectious Disease support he will need in the coming weeks all in one facility. Mr.

---

[34]SEALED Admin. Rec. at 2, Docket No. 51.

[35]SEALED Admin. Rec. at 51, Docket No. 51.

[36]SEALED Admin. Rec. at 51, Docket No. 51.

[37]SEALED Admin. Rec. at 51, Docket No. 51.

> Messina has arranged for Angel Medical Flight
> ... to transport his son tonight.[38]

D.M., accompanied by his parents, was transported from Maine to Tampa by air ambulance.  On the way from Waldo to the airport, D.M. began screaming loudly with his arms over his face and complaining of severe knee pain.[39]  During the ground transport from the airport in Tampa to the hospital, D.M. complained of pain with movement of the ambulance over the road.[40]  D.M. was admitted to Tampa General on June 14, 2010 and was discharged on June 25, 2010. A note in defendant's file on June 16, 2010 stated that D.M. "transferred from acute care hospital in Maine for family convenience[.]"[41] The air ambulance company, Angel MedFlight, noted in its records that "Dr. Nelson requested the emergent medical transportation of [D.M.] without the time to await for any form of pre-authorization[42] from his insurance carrier."[43]  On February 24, 2011, plaintiff confirmed that she did not contact defendant to verify if the air ambulance service would be covered, but that she

---

[38]SEALED Admin. Rec. at 53, Docket No. 51.

[39]SEALED Admin. Rec. at 42, Docket No. 51.

[40]SEALED Admin. Rec. at 45, Docket No. 51.

[41]SEALED Admin. Rec. at 13, Docket No. 51.

[42]Defendant makes much of the fact that plaintiff did not obtain pre-authorization but plaintiff contends that pre-authorization was not required and thus argues that whether she obtained it or not is irrelevant.

[43]SEALED Admin. Rec. at 37, Docket No. 51.

-9-

and her husband had "consulted and examined our plan coverage documents" and that Angel MedFlight had said "they would handle it."[44]

On June 23, 2010, Angel MedFlight submitted a claim for $303,140.00 to defendant.[45]  Attached to the claim was an "air ambulance letter of medical necessity" from Dr. Nelson.  Dr. Nelson explained that Maine Medical and Mass General had been considered as transfer options but that Maine Medical did not have a bed and no physician at Mass General was willing to take D.M. as a patient.[46] Dr. Nelson further explained that "[i]t was decided that Tampa General was the most appropriate facility and [D.M.] would be accepted as a patient which would gain him access to the needed medical professionals in pediatric psychiatry, infectious disease, and pediatric hospitalist, Dr. Lisa Rodriquez, M.D."[47]  Dr. Nelson stated that D.M.

---

[44]SEALED Admin. Rec. at 794, Docket No. 51.

[45]SEALED Admin. Rec. at 24, Docket No. 51.  Defendant contends that the claim was misdirected because Angel MedFlight submitted the claim under cover of an Aetna Member Complaint and Appeal Form and that this misdirection led to the delay in resolving the claim. SEALED Admin. Rec. at 16, Docket No. 51.  Defendant also makes much of the fact that Angel MedFlight has not pursued full payment from plaintiff for the air ambulance service (plaintiff made a down payment of $15,300 for the air ambulance service.  SEALED Admin. Rec. at 794, Docket No. 51).  Plaintiff argues that this is irrelevant to the question of whether defendant abused its discretion in denying her claim.

[46]SEALED Admin. Rec. at 29, Docket No. 51.

[47]SEALED Admin. Rec. at 29, Docket No. 51.

would be able to travel by no other means than
air medical transportation (fixed wing air-
craft) due to his current medical state.  This
patient would need also to be transported, by
the shortest possible route, by ground ambu-
lance to/from each airport to meet the medi-
cally configured aircraft.  Transportation via
commercial airline is not an option for this
patient.  The commercial airlines will not
provide a safe environment for travel due to
his current femoral block nor would [D.M.] be
able to tolerate a commercial flight because of
pain.  Ground transportation is not an option
due to time and distance.[48]

On July 30, 2010, defendant denied the claim because the
"[s]ervice[s] [were] not medically necessary."[49]  On August 5, 2010,
Angel MedFlight requested that defendant "reprocess and reconsider"
its claim because it had "received additional medical records that
support the claim."[50]  Angel MedFlight asked that the "request for
reprocessing ... not be construed as a provider or member appeal."[51]

On September 20, 2010, Angel MedFlight, as the authorized
representative of plaintiff and D.M., filed a first level member
appeal of the denial.[52]  On October 6, 2010, defendant advised Angel
MedFlight that

[a]fter a diligent search for the claims
records of [D.M.] using the information you

---

[48]SEALED Admin. Rec. at 29, Docket No. 51.

[49]SEALED Admin. Rec. at 157, Docket No. 51.

[50]SEALED Admin. Rec. at 296, Docket No. 51.

[51]SEALED Admin. Rec. at 296, Docket No. 51.

[52]SEALED Admin. Rec. at 160, Docket No. 51.

> provided, we have come up with no claim records
> for this insured for the time period specified
> in your request.
>
> If you can provide us with documentation
> generated by Aetna Health Inc. (or one of our
> member companies), we will be pleased to search
> our systems again.[53]

There was also some internal confusion at this time as to whether this was a member appeal or a provider appeal, even though it was clearly a member appeal.[54]

On January 12, 2011, defendant issued a decision on the level one appeal,[55] "upholding the previous decision to deny payment for the air ambulance services, speciality care transport [D.M.] received on June 14, 2010."[56]  Defendant advised that "[a] medical director, board certified in internal medicine and hematology, who was not involved in the original decision, participated in the review of the appeal."[57]  Defendant set forth the information that it had reviewed in reaching its decision, which included Clinical

---

[53]SEALED Admin. Rec. at 336, Docket No. 51.

[54]SEALED Admin. Rec. at 263, Docket No. 51.

[55]Defendant concedes that "adjudication of [this] appeal was delayed."  Defendant Aetna's Response Brief re: Judgment on the Administrative Record at 15, Docket No. 49.

[56]SEALED Admin. Rec. at 275, Docket No. 51.

[57]SEALED Admin. Rec. at 276, Docket No. 51.

Policy Bulletin (CPB) 224 - Ambulance Transport.[58]   Defendant
explained that:

> Covered expenses include charges for transpor-
> tation to a hospital by air or water ambulance
> when:
>
> • Ground ambulance transportation is not
>   available; and
> • Your condition is unstable, and requires
>   medical supervision and rapid transport;
>   and
> • In a medical emergency, transportation
>   from one hospital to another; when the
>   first hospital does not have the required
>   services or facilities to treat your
>   condition and you need to be transported
>   to another hospital; and the two condi-
>   tions above are met.
>
> • Not covered under this benefit are charges
>   incurred to transport you;
>
> • If an ambulance service is not required by
>   your physical condition; or
> • If the type of ambulance service provided
>   is not required for your physical condi-
>   tion; or
> • By any form of transportation other than
>   a professional ambulance service.[59]

Although nothing in the denial letter so indicates, this language
is apparently from Clinical Policy Bulletin 224.  Defendant further
explained that

> [i]n this case, it is agreed that transporta-
> tion by ambulance was indicated.  However, the
> criteria for transport by air rather than
> ground was not met.  Waldo General Hospital is
> in Maine and the receiving hospital was in

---

[58]SEALED Admin. Rec. at 275, Docket No. 51.

[59]SEALED Admin. Rec. at 276, Docket No. 51.

> Tampa, Florida.  The required specialities were
> pediatric psychiatry and infectious disease.
> It does not appear that the closest facility to
> obtain these services would be in Florida.[60]

In the denial letter, defendant also set out the "Covered Benefits"
language from the Plan and the Plan's definition of "medically
necessary".[61]  Defendant advised that a second level appeal could
be taken[62] and enclosed a copy of a document entitled "Aetna Appeal
Process and Members Rights",[63] which stated that an external review
could be requested if a member disagreed with a second level
decision.[64]

On April 19, 2011, Angel MedFlight submitted a second level
appeal.[65]  Defendant contends that it perceived Angel MedFlight's
April 19 submission to be a provider request for review of a benefit
decision, even though Angel MedFlight stated that it was filing the
appeal on behalf of plaintiff and D.M.  On May 3, 2011, defendant
sent a response to Angel MedFlight, in which it stated that it had
"determined that this member's group benefits coverage allows no

---

[60]SEALED Admin. Rec. at 276, Docket No. 51.

[61]SEALED Admin. Rec. at 276-277, Docket No. 51.

[62]SEALED Admin. Rec. at 277, Docket No. 51.

[63]SEALED Admin. Rec. at 277, Docket No. 51.

[64]SEALED Admin. Rec. at 279, Docket No. 51.  This conflicts
with the Plan language which provides that an external review is
available "[a]t any time in the process...."  SEALED Admin. Rec. at
133, Docket No. 51.

[65]SEALED Admin. Rec. at 283, Docket No. 51.

-14-

additional payment as services not medically necessary."[66] Defendant further stated:

> Our records indicate that we processed this claim according to the provisions of this individual's plan.  On 07-29-2010, we denied these services according to the plan contract. Therefore, our previous decision stands, and no further benefits are due.[[67]]

Defendant advised Angel MedFlight of its provider appeal rights.[68]

On August 1, 2011, plaintiff commenced this case.  In her amended complaint, plaintiff asserts two counts.  Count I is a claim to recover benefits and Count II is a claim based on defendant's alleged failure to produce documents.  Count II of plaintiff's amended complaint has been dismissed.[69]  The briefing on plaintiff's Count I is complete and this case is ready for disposition.

<u>Discussion</u>

When, as here, an ERISA plan grants the administrator the discretion to determine eligibility for benefits, the court generally reviews the administrator's decision for an abuse of discretion.  <u>Salomaa v. Honda Long Term Disability Plan</u>, 642 F.3d 666, 673 (9th Cir. 2011).  However, "the standard of review shifts to de novo if the administrator engages in 'wholesale and flagrant

---

[66]SEALED Admin. Rec. at 312, Docket No. 51.

[67]SEALED Admin. Rec. at 312, Docket No. 51.

[68]SEALED Admin. Rec. at 312, Docket No. 51.

[69]Order Granting Stipulation to Dismiss with Prejudice Count II of Plaintiff's Amended Complaint at 1, Docket No. 42.

violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well.'" Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trustees, 588 F.3d 641, 646-47 (9th Cir. 2009) (quoting Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 971 (9th Cir. 2006)).

> [A]n example of that rare class of cases in which a procedural violation crosses the line so as to warrant de novo review [is] Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir. 1984).... In Blau, the ERISA administrator kept the plan details secret from employees, provided no claims procedure, and never gave employees in writing the details of the plan[.]

Id. at 647 n.1 (citations omitted). Although there were some procedural irregularities in this case (which will be discussed below in detail), this case did not involve the type of wholesale and flagrant violations of ERISA procedures found in Blau. The court will review defendant's denial decision for an abuse of discretion.

Under the abuse of discretion standard, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" Salomaa, 642 F.3d at 675 (quoting Conkright v. Frommert, 130 S. Ct. 1640, 1651 (2010)). A plan administrator abuses its discretion if it "(1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan, 410 F.3d 1173, 1178 (9th Cir. 2005).

-16-

The court's "review is 'tempered by skepticism' when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits." Harlick v. Blue Shield of Calif., 686 F.3d 699, 707 (9th Cir. 2012) (quoting Abatie, 458 F.3d at 959, 968-69). "In such cases, the conflict is a 'factor' in the abuse of discretion review." Id. The court's "review of the administrator's decision is also tempered by skepticism if the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim." Id.

In this case, the court's review is tempered by skepticism because defendant failed to comply with ERISA procedures. An ERISA administrator must

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

Defendant failed to provide adequate notice in writing as to why it was denying plaintiff's claim. The notice requirement "calls for ... a meaningful dialogue between ERISA plan administrators and their beneficiaries.  If benefits are denied in whole or in part,

-17-

the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial[.]" <u>Booton v. Lockheed Medical Ben. Plan</u>, 110 F.3d 1461, 1463 (9th Cir. 1997).  In its first denial letter, defendant simply stated that the claim was denied because "Service(s) not medically necessary".[70]  There was no further explanation as to why the claim was being denied and no reference to any provision of the Plan.  In its second denial letter, defendant cites to Clinical Policy Bulletin 224 and then states that D.M. did not meet the criteria for air ambulance services but does not clearly explain which of the criteria he did not meet.[71]  In its final letter, defendant again stated that it was denying the claim because the services were not medically necessary and according to the terms of the Plan,[72] but failed to state what provisions of the Plan it was referring to or provide any explanation as why the air ambulance service did not meet the definition of "medically necessary." Defendant plainly failed to meet the "meaningful dialogue" requirement.

     An administrator must also provide "'reasonable access to, and copies of all, documents, records, and other information relevant to the claimant's claim for benefits.'"  <u>Salomaa</u>, 642 F.3d at 679

---

[70]SEALED Admin. Rec. at 157, Docket No. 51.

[71]SEALED Admin. Rec. at 276, Docket No. 51.

[72]SEALED Admin. Rec. at 312, Docket No. 51.

(quoting 29 C.F.R. § 2560.503-1(h)(2)(iii)).  In <u>Salomaa</u>, "[t]he plan evidently based its denial in large part on review of Salomaa's file by two physicians, one for the first denial, another for the final denial.  They both wrote their appraisals for the plan administrator.  Yet the plan failed to furnish their letters to Salomaa or his lawyer." <u>Id.</u>  The court found that the administrator had not provided sufficient material to meet the requirement of "meaningful dialogue." <u>Id.</u>

Similarly here, defendant failed to provide material sufficient to meet the "meaningful dialogue" requirement.  In denying the first level appeal, defendant apparently relied on Clinical Policy Bulletin 224, which is not part of the Plan, but never provided plaintiff with a copy of this bulletin at any time.

Plaintiff next argues that defendant's conflict of interest strongly influenced the denial decision.  Defendant has a conflict of interest because it both "makes the coverage decisions and pays for the benefits." <u>Harlick</u>, 686 F.3d at 707.  "[T]he conflict is 'more important ... where circumstances suggest a higher likelihood that it affected the benefits decision.'" <u>Id.</u> (quoting <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 117 (2008)).  "The conflict is less important when the administrator takes active steps to reduce potential bias and to promote accuracy, such as employing a neutral, independent review process, or segregating employees who make coverage decisions from those who deal with the company's finances."

Id. (internal citations omitted).  "The conflict is [also] given more weight if there is a 'history of biased claims administration.'"  Id. (quoting Glenn, 554 U.S. at 117).

Here, there is no evidence of a history of biased claims administration.  But, there is some evidence that defendant was not taking steps to reduce potential bias.  Defendant's internal case summary sets forth a series of statements by individuals who do not appear to be shielded or walled off from previous decisions.  The internal case summary notes also seem to indicate that defendant had decided that it was not going to pay for a transfer to any hospital outside of Maine no matter what the Plan language said, what D.M.'s condition was, or whether any Maine hospital would accept D.M.  This suggests that defendant's denial was based on financial concerns.  In arguing that the conflict should be given little weight, defendant points out that plaintiff had the option of an independent external review of her claim but that she never took advantage of this option, but it should be noted that the information that plaintiff was provided about this option by defendant during the appeal process conflicted with the terms of the Plan.  Defendant's conflict of interest will be given some weight in the court's review of the administrator's decision.

Plaintiff also argues that very little deference should be given to the administrator's decision because defendant gave inconsistent reasons for its denial of the claim.  However,

defendant consistently told plaintiff that her claim was being denied because air ambulance service was not medically necessary.

Defendant argues that the court should uphold its decision because its denial of the claim was both reasonable and correct. Defendant argues that the evidence shows that it was not medically necessary to transport D.M. by air ambulance but rather that air ambulance service was used for the convenience of the family and that air ambulance service was far more costly than an equally effective ambulance service by ground. Defendant argues that nothing about D.M.'s condition on June 14, 2010 indicated that this transport was an emergency because at that point, D.M. had been in the hospital for seven days, his condition was listed as "improved and stable",[73] his wounds were clean and dry and required no attention,[74] and his pain level was 5/10.[75] Defendant argues that D.M. was plainly capable of being transported by ground ambulance, and in fact contends that he was transported by ground ambulance, without incident, from Waldo to the Maine airport and from the Tampa airport to Tampa General. Defendant also contends that there is no evidence in the record that Tampa General, which was located 1500 miles from Waldo, was the only hospital that could provide the services that D.M. required. Rather, defendant contends that the

---

[73]SEALED Admin. Rec. at 246, Docket No. 51.

[74]SEALED Admin. Rec. at 173, Docket No. 51.

[75]SEALED Admin. Rec. at 246, Docket No. 51.

choice of Tampa General was dictated by D.M.'s parents for their convenience.  Defendant also contends that the record shows that there was no effort to involve it in the selection of a facility that would be appropriate for D.M.'s transfer.  Defendant insists that its decision to deny plaintiff's claim was reasonable and correct because air ambulance service was simply the most convenient way to return D.M. and his parents to Florida.

There are several problems with defendant's argument.  First, defendant appears to be ignoring the opinion of Dr. Nelson, D.M.'s treating physician, that air ambulance transport was medically necessary.  While defendant is correct that there are internal notes about family convenience, at no time did defendant ever communicate to plaintiff that it was denying her claim based on the convenience factor.  Although the Plan contains language that provides that a service is not medically necessary if it is done for convenience, plaintiff had no way of knowing this is why defendant was denying her claim.

As for defendant's contention that there was no "emergency", D.M.'s discharge notes do indicate that his overall condition was improved and stable and that his wounds were clean and dry, but those notes also indicate that D.M.'s staph infection was not under control.  Moreover, defendant acknowledged that transport by ambulance was called for in this case, which seems to indicate that this transport was an emergency.

Defendant's contention that D.M. was transported by ground ambulance between the airports and hospitals "without incident" is not supported by the record.  On the trip from Waldo to the Maine airport, D.M. was screaming in pain and on the trip from the Tampa airport to Tampa General, D.M. complained of pain because of bumps in the road.

Defendant's contention that there was no effort to involve it in selecting a hospital for D.M. is also not supported by the record.  The Waldo UR department kept defendant in the loop as to D.M.'s condition and the need to transfer D.M. to a different hospital.  Defendant simply kept insisting that there was a hospital within the "service area", i.e., within Maine, to which D.M. could be transferred, even though according to Dr. Nelson this was not correct.[76]  Defendant never suggested a hospital to which D.M. could be transferred that was ready, willing, and able to admit D.M. as a patient.

"[T]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether" the court is "'left with a definite and firm conviction that a mistake has been committed'" and the court "may not merely substitute [its] view for that of the fact finder." Salomaa, 642 F.3d at 676 (quoting United States v. Hinkson 585 F.3d 1247, 1262 (9th Cir. 2009)).  If Clinical Policy Bulletin 224 governs when air ambulance service is medically necessary, based

---

[76]See SEALED Admin. Rec. at 307, Docket No. 51.

on the facts of this case, it was an abuse of discretion for defendant to conclude that D.M. did not meet the criteria. Clinical Policy Bulletin 224 provides that air ambulance service is covered when

- Ground ambulance transportation is not available; and
- Your condition is unstable, and requires medical supervision and rapid transport; and
- In a medical emergency, transportation from one hospital to another hospital; when the first hospital does not have the required services or facilities to treat your condition and you need to be transported to another hospital; and the two conditions above are met.[77]

Ground transportation was not available because the most appropriate hospital was several hundred miles away.[78]  D.M. could not have reasonably been transported by ground ambulance because neither Maine Medical and Mass. General would take D.M. as a patient.  D.M.'s condition was not necessarily stable because his staph infection was uncontrolled, and as noted above, defendant agreed that transport by ambulance was required, thereby indicating some level of "emergency."  Finally, transportation to a different hospital was necessary because Waldo General did not have any infectious disease doctors or pediatric psychiatrists.

---

[77]SEALED Admin. Rec. at 272, Docket No. 51.

[78]SEALED Admin. Rec. at 29, Docket No. 51 (Dr. Nelson opined that given that Maine Medical and Mass General would not take D.M., Tampa General was the most appropriate facility to which to transfer D.M.).

In sum, after reviewing defendant's denial with a fair amount of skepticism because of the procedural irregularities and the conflict of interest, the court is left with a definite and firm conviction that a mistake has been committed.  Defendant abused its discretion in denying plaintiff's claim.

<u>Conclusion</u>

The decision of the plan administrator is reversed.  The clerk of court shall enter judgment declaring that plaintiff is entitled to payment in the amount of $303,140 for the air ambulance services provided to D.M.

DATED at Anchorage, Alaska, this <u>17th</u> day of January, 2013.

/s/ H. Russel Holland<br>United States District Judge